# UNITED STATES DISTRICT COURT
### for the
### Central District of California

In the Matter of the Search:

**TARGET DEVICE 1**: a white Apple iPhone, model A1660, FCC ID BCG-E3085A, with a white sticker bearing the words "All Packs Land," and

Case No. **2:21-MJ-05463**

**TARGET DEVICE 2**: a red Apple iPhone, with an unknown serial number inside a clear case.

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A.**

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and possession with intent to distribute a controlled substance. |
| 21 U.S.C. § 846 | Conspiracy to distribute or possess with intent to distribute a controlled substance. |

The application is based on these facts: **See attached Affidavit.**
☒ Continued on the attached sheet.

_____
/s/ Special Agent Albert Polito III
*Applicant's signature*
DEA Special Agent Albert Polito III
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:_____

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
*Printed name and title*

AUSA: Gregory Bernstein (213-393-5646)

## ATTACHMENT A

**PROPERTY TO BE SEARCHED**

The following two digital device (collectively the "**TARGET DEVICES**") that were seized from the possession of **Israel Raymond Ross** ("**Ross**") on August 24, 2021, and which are currently in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California:

a.   **TARGET DEVICE 1:** a white Apple iPhone, model A1660, FCC ID BCG-E3085A, with a white sticker bearing the words "All Packs Land," seized from the trunk of **Ross**'s vehicle, and

b.   **TARGET DEVICE 2:** a red Apple iPhone, with an unknown serial number inside a clear case, seized from **Ross**'s person.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "Target Offenses"), namely:

a.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers,

b.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls,

c.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from the **TARGET DEVICES** and which relate to the Target Offenses,

d.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),

SMS text, email communications, or other text or written communications sent to or received from the **TARGET DEVICES** and which relate to the Target Offenses,

e.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, along with travel records,

f.   Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the Target Offenses,

g.   Contents of any calendar or date book,

h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations, and

i.   Any device used to facilitate the Target Offenses (and forensic copies thereof).

j.   Any **TARGET DEVICE** which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Target Offenses, and forensic copies thereof.

k.   With respect to any **TARGET DEVICE** containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were

created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat and instant messaging logs, photographs, and correspondence,

       ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

       iii. evidence of the attachment of other devices,

       iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

       v.   evidence of the times the device was used,

       vi.  passwords, encryption keys, and other access devices that may be necessary to access the device,

       vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it,

       viii.   records of or information about Internet Protocol addresses used by the device,

       ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR THE TARGET DEVICE

3.   In searching a **TARGET DEVICE** (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any **TARGET DEVICE** capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each **TARGET DEVICE** where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the **TARGET DEVICE** as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each **TARGET DEVICE** capable of containing any of the items to be seized to the search protocols to determine whether the **TARGET DEVICE** and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a **TARGET DEVICE** does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the **TARGET DEVICE** and delete or destroy all forensic copies thereof.

g.   If the search determines that a **TARGET DEVICE** does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

   h. If the search determines that the **TARGET DEVICE** is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   i. The government may also retain a **TARGET DEVICE** if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   j. After the completion of the search of the **TARGET DEVICE**, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  2. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

3.    During the execution of this search warrant, law enforcement is permitted to (1) depress **Israel Raymond Ross**'s thumb and/or fingers on the **TARGET DEVICE** and (2) hold the **TARGET DEVICE** in front of **Ross** with the party's eyes open to activate the facial, iris, and/or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989), specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Albert Polito III, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of an application for a warrant to search the following two digital devices (collectively the "**TARGET DEVICES**") that were seized from the possession of **Israel Raymond Ross** ("**Ross**") on August 24, 2021, and which are currently in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California:

a.     **TARGET DEVICE 1:** a white Apple iPhone, model A1660, FCC ID BCG-E3085A, with a white sticker bearing the words "All Packs Land," seized from the trunk of **Ross**'s vehicle, and

b.     **TARGET DEVICE 2:** a red Apple iPhone, with an unknown serial number inside a clear case, seized from **Ross**'s person.[1]

2.     The requested warrant seeks authorization to search for and seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances)("Target Offenses"), as described in Attachment B.

3.     Attachments A and B are incorporated into this affidavit by reference.

---

[1] For clarity, target facilities are capitalized and bold (e.g., **TARGET DEVICE 1**), and target subjects are lower case and bold (e.g., **Ross**).

4.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.

5.    This affidavit is intended to show only that there is probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

6.    Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Further, unless stated otherwise, all dates and amounts in this affidavit are approximations, and the words "on or about" and "approximately" are omitted for clarity.

<u>**BACKGROUND OF AFFIANT**</u>

7.    I am a Special Agent with the DEA and have been so employed since January 2020. I am currently assigned to the DEA's High Intensity Drug Trafficking Area Group 48, which investigates large-scale drug trafficking organizations. During my time with the DEA, I have received 640 hours of narcotics law enforcement training while attending DEA Basic Agent Training at the DEA Academy in Quantico, Virginia.

8.    I have participated in investigations into drug trafficking and drug trafficking organizations. These investigations involved (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of drugs (including cocaine, heroin, fentanyl,

2

methamphetamine, and marijuana), (2) the laundering of drug proceeds and monetary instruments derived from drug trafficking activities, and (3) conspiracies to traffic controlled substances. I am familiar with the methods drug traffickers use to conceal profits and launder proceeds of narcotics transactions. I am also experienced in the use of tracking devices, conducting surveillance, interviewing witnesses, writing affidavits for and participating in the execution of search warrants, and working with undercover agents, cooperating defendants, and confidential sources.

## SUMMARY OF PROBABLE CAUSE

9.    Starting in early October 2020, a DEA confidential source ("the CS") began communicating with **Michael Pasquel Reyes-Vasquez II** ("**Vasquez**") over Snapchat. The CS told agents that **Vasquez** worked for a criminal group called All Packs Land that sold various controlled substances. Over the next 10 months, the DEA conducted several operations targeting **Vasquez** and **Israel Raymond Ross** ("**Ross**"), who was **Vasquez**'s fentanyl pill supplier.

10.    On October 28, 2020, agents conducted a controlled purchase through the CS of 1,000 fentanyl pills, weighing 107.8 grams, from **Ross** and **Vasquez.**

11.    On January 14, 2021, agents conducted another controlled purchase through the CS of 1,000 fentanyl pills, this time weighing 112 grams, from **Ross** and **Vasquez.**

12.    Finally, on August 24, 2021, the DEA arranged a controlled purchase of 14,000 fentanyl pills from **Ross** and

**Vasquez.** As Ross travelled to the site of the anticipated drug transaction, law enforcement conducted a traffic stop of **Ross** and a probable cause search of **Ross'**s vehicle. Inside **Ross'**s vehicle, law enforcement discovered approximately 14,000 fentanyl pills (weighing 1,527 grams) and **TARGET DEVICE 1**. On **Ross'**s person, law enforcement found **TARGET DEVICE 2**.

<u>**STATEMENT OF PROBABLE CAUSE**</u>

13.  Based on my review of law enforcement reports, surveillance, my review of social media data, my review of recorded phone calls and text messages between the targets of this investigation and the CS, my review of audio and video recordings from the operations described in this affidavit, my own observations and knowledge of the investigation, and other reliable sources of information, I am aware of the following:

14.  Starting in October 2020, a DEA confidential source ("the CS") began communicating with **Vasquez** over Snapchat.[2] The CS told agents that **Vasquez** worked for a criminal group called "All Packs Land" ("APL") that sold various drugs, including fentanyl tablets and cocaine. The CS also provided agents with videos and photographs he took of **Vasquez'**s Snapchat posts in which **Vasquez** markets drugs, including fentanyl pills.

---

[2] The CS is working for monetary compensation, and not to reduce charges. The CS has no criminal convictions, though in November 2021 was arrested for vandalizing a car with a key, and during a DEA operation in May 2021 was found in possession of a marijuana pipe and small amount of marijuana. To my knowledge, the CS has never made a statement to law enforcement that was later found to be false. I believe that the CS is reliable. The actions of the CS described in this affidavit were at the direction of law enforcement.

a.   **Ross and Vasquez sell the CS 1,000 fentanyl pills on October 28, 2020**

15.   Following the initial debrief, at the direction of DEA agents, as reflected in recorded phone calls and text messages, the CS contacted **Vasquez** to purchase 1,000 fentanyl pills for $5,000.[3] **Vasquez** and the CS agreed to meet in a nearby Costco parking lot on October 28, 2020.

16.   On October 28, 2020 at around 4:15 p.m., agents met with the CS a neutral location and searched the CS for contraband with negative results. At the neutral location the agents provided the CS with a car to meet **Vasquez** and $5,000 in official authorized funds to purchase the pills. The agents also equipped the CS with an audio-recording device.[4] The CS then drove to the Costco parking lot.

17.   At around 5:02 p.m., **Vasquez** texted the CS that he was at 1903 Holly Avenue, Ontario, California ("the Holly Avenue residence"), which was the address on **Vasquez**'s driver's license. **Vasquez** later told the CS to meet him (**Vasquez**) at the Holly Avenue residence. However, for safety concerns, one of the DEA case agents directed the CS to tell **Vasquez** to meet in a parking lot at 1848 South Euclid Avenue, Ontario, California ("the South Euclid lot"), which is in close proximity to the

---

[3] The CS and Vasquez normally referred to fentanyl pills as "the blues" on account of the blue color of the pills. For the purpose of this affidavit, I use the term "fentanyl pills."

[4] The vehicle the CS drove was equipped video-recording equipment, but that equipment malfunctioned and failed to record the meeting. Instead, the video from the CS's car was streamed to agents, one of whom recorded a short portion of the video with his cell phone.

Holly Avenue residence. Meanwhile, surveillance agents saw a white BMW X6, registered to Maryann Candy Ross at a residence on East Sentinel Privado, Ontario, California ("the Sentinel residence"), arrive at **Vasquez**'s Holly Avenue residence. **Vasquez** then got into the car and the BMW drove away.

18.  At 7:13 p.m., surveillance agents saw the BMW pull into the South Euclid lot and parked near the CS's vehicle. A few moments later, **Vasquez** and the driver of the car, who agents later identified as **Ross**, got out of the BMW and into the CS's vehicle with **Vasquez** in the front passenger seat and **Ross** in the rear seat.

19.  In the car, the CS's audio device recorded the CS confirming that **Ross** and **Vasquez** were supplying 1,000 pills and the CS counting out the money for **Ross** and **Vasquez.** At the end of the deal, **Ross** told the CS that his name was "Izzy." Surveillance agents then saw **Ross** and **Vasquez** get out of the CS's vehicle, return to the BMW, and drive to **Vasquez**'s Holly Avenue residence.

20.  The CS subsequently returned to a neutral location where he provided the agents with a bag containing 1,000 pills he acquired during the transaction, and the agents searched the CS and his vehicle for contraband with negative results. During the debrief the CS told agents that in exchange for the $5,000, **Ross** handed the CS the 1,000 fentanyl pills.

21.  A report from the DEA Southwest Laboratory shows that the 1,000 pills **Ross** and **Vasquez** sold the CS consisted of 107.8

grams of a mixture and substance containing fentanyl and acetaminophen.

**b.     Ross and Vasquez sell the CS 1,000 fentanyl pills on January 14, 2021**

22.   In late 2020 and early 2021, the DEA had the CS arrange a second controlled purchase from **Ross** and **Vasquez** for an additional 1,000 fentanyl pills at the South Euclid parking lot. Thereafter, the CS agreed to meet with **Vasquez** on January 14, 2021 to purchase another 1,000 fentanyl pills. This phone call was recorded.

23.   On January 14, 2021, at around 10:20 a.m., agents met with the CS at a neutral location where the CS was searched for contraband with negative results. The agents then gave the CS $4,500 in official authorized funds to buy the 1,000 fentanyl pills from **Ross** and **Vasquez.** The agents also equipped the CS with an audio-recording device, and provided the CS with a vehicle that contained video-recording equipment.

24.   At 10:35 a.m., the CS drove to the South Euclid parking lot. **Vasquez** then contacted the CS and told him that **Ross** was running late and would not pick up **Vasquez** until closer to 12:00 p.m. This phone call was recorded.

25.   At 12:50 p.m., an agent surveilling the Holly Avenue address saw **Vasquez** walk out of the residence, get into a Honda Civic ("the Civic"), and drive away in the direction of the South Euclid parking lot. At 1:08 p.m., an agent saw **Vasquez** pull into the South Euclid parking lot and get out of the Civic with a shopping bag in his hand that contained an APL tee shirt

(that, as described below, **Vasquez** later gave to the CS as a gift). **Vasquez** then got into the CS's vehicle.

26.   At 1:22 p.m., **Vasquez** got out of the CS's vehicle and looked around, likely for **Ross**. Contemporaneously, an agent saw **Ross**, in the passenger seat of a Nissan Altima ("the Altima"), drive into the South Euclid lot, park, and enter the rear passenger seat of the CS's car. On the CS's recording device, **Ross** can be heard talking about the quality of the pills he sold the CS.

27.   Within minutes, **Ross** got out of the CS's car and returned to the Altima, which was being driven by an unknown female. **Vasquez** got out of the CS's car and returned to his Civic. Both targets then departed from the South Euclid lot, and agents followed **Ross** to the Sentinel residence.

28.   The cameras in the CS's vehicle recorded **Ross** (left) and **Vasquez** (right) as follows:

 

29.   After the deal, agents met with the CS at a neutral location where the CS provided the agents with a bag containing the 1,000 pills he acquired from **Ross** and **Vasquez**.

30.   During the debrief the CS told agents that **Vasquez** got
into the CS's car and gifted the CS the APL tee shirt. **Vasquez**
also told the CS that **Ross** was bringing the pills, but that **Ross**
did not press the pills himself, and instead acquired the drugs
from another source. According to the CS, **Ross** then entered the
vehicle, apologized for being late, and handed the CS the
agreed-upon 1,000 pills. In exchange the CS gave **Vasquez** $4,500.
**Vasquez** took $500 and gave the rest of the money to **Ross.**

31.   A report from the DEA Southwest Laboratory shows that
the 1,000 pills **Ross** and **Vasquez** sold the CS consisted of 112
grams of a mixture and substance containing fentanyl.

**c.    California Highway Patrol stops Ross with 14,000
        fentanyl pills and the TARGET TELEPHONES as he travels
        to drug deal**

32.   In August 2021, at the direction of DEA agents, and as
reflected in recorded communications between the CS and **Vasquez,**
the CS again communicated with **Vasquez** to purchase 14,000
fentanyl pills from **Ross** and **Vasquez.** The CS and **Vasquez** agreed
to meet on August 24, 2021 at the South Euclid lot to conduct
the transaction.

33.   That day, at around 10:30 a.m., agents set up
surveillance on **Ross**'s Sentinel address. Shortly thereafter **Ross**
drove the BMW into the garage of the Sentinel residence.

34.   At 5:00 p.m., the CS called **Vasquez** to make sure
everything was ready and **Vasquez** replied that he would "call
Izzy right now," referring to **Ross.** This call was recorded.

35.   At 5:22 p.m., agents saw the BMW drive out of the
garage and away from the Sentinel residence, traveling in the

direction of the South Euclid lot. At 5:36 p.m., **Vasquez** sent the CS a text message stating "He's on his way to me," which I believe was referring to **Ross**.

36.  At 5:40 p.m., Officer Rodriguez of the California Highway Patrol ("CHP"), at the direction of the DEA, conducted a traffic stop of the BMW as **Ross** was travelling on South Euclid Avenue to the meeting location. Officer Rodriguez was traveling with his canine Mike. The basis for the stop was that Officer Rodriguez observed that the BMW had illegally tinted windows, in violation of California Vehicle Code Section 26708(a)(1).

37.  During the traffic stop, CHP officers identified **Ross** as the driver and Individual 1 (a minor) as the passenger, and immediately detected the odor of marijuana. When Officer Rodriguez asked **Ross** whether he had an open marijuana container in the car, **Ross** took an unsealed bag of marijuana from the center console and said "this," and told the officer that he had another container of marijuana in the driver's side door. The officer then asked **Ross** where he was going, and **Ross** named a restaurant in the opposite direction of where he was traveling, then said he was going to a friend's house.

38.  Next, Officer Rodriguez ran his canine Mike against the car with positive results.

39.  CHP officers then conducted a probable cause search of **Ross**'s BMW. In the trunk, officers found 14,000 fentanyl pills. Law enforcement also found **TARGET TELEPHONE 1** in the trunk of **Ross**'s BMW. Officers then placed **Ross** under arrest. Officers

searched **Ross**'s person incident to that arrest, and discovered **TARGET TELEPHONE 2** in his pocket.

40.  A report from the DEA Southwest Laboratory shows that the 14,000 pills **Ross** possessed in his BMW consisted of 1,527 grams of a mixture and substance containing fentanyl and acetaminophen.

## TRAINING AND EXPERIENCE ON DRUG TRAFFICKING

41.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous coconspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various coconspirators tend to be ongoing

until their arrest. Communications between people buying and
selling drugs take place by telephone calls and messages, such
as email, text messages, and social media messaging
applications, sent to and from cell phones and other digital
devices. This includes sending photographs or videos of the
drugs between the seller and the buyer, the negotiation of
price, and discussion of whether or not participants will bring
weapons to a deal. In addition, it is common for people engaged
in drug trafficking to have photographs and videos on their cell
phones of drugs they or others working with them possess, as
they frequently send these photographs to each other and others
to boast about the drugs or facilitate drug sales. It is also
common for drug traffickers to carry cell phones in order to
remain in contact with drug suppliers or customers, to
communicate with coconspirators to facilitate drug trafficking,
to coordinate the movements of the trafficker and various
coconspirators, and to coordinate the amount of drugs
trafficked, as well as payment amounts and methods. Based on my
training and experience, I know that the above-described
information can be stored on digital devices carried by drug
traffickers.

      d.  Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices. Drug traffickers often keep records of
meetings with associates, customers, and suppliers on their
digital devices, including in the form of calendar entries and
location data, such as Global Positioning System ("GPS")

information, other locational information, and identifying
information about the trafficker and coconspirators and the
location of previous drug transactions or stash houses, and/or
the identity or whereabouts of traffickers and coconspirators
involved in narcotics trafficking.

     e.   It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers. These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

     f.   In the case of drug couriers, cell phones or
digital devices are also commonly used to communicate
itineraries to couriers and provide directions to couriers along
their route and once they arrive at their destination.

     g.   To that end, I know that drug traffickers and
drug couriers use cell phones to further various aspects of the
drug trade. Drug traffickers and drug couriers use cell phones
to contact (by way of both voice call and electronic message)
drug suppliers, customers, and coconspirators, all for the
purpose of acquiring, storing, transporting, and distributing
drugs. Drug traffickers also maintain, on their cell phones,
records related to drug distribution (e.g., ledgers and notes
pertaining to drug sales), and photographs of drugs, drug
paraphernalia, and the instruments of the drug trade (including

firearms). Further, the location data associated with a drug trafficker's cell phones (which is often stored locally on cell phones) assists investigators in identifying the drug trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, and meeting locations.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

42.  As used herein, the term "digital devices" includes the **TARGET DEVICES.**

43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear, rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

14

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files, recently
used tasks and processes, online nicknames and passwords in the
form of configuration data stored by browser, email, and chat
programs, attachment of other devices, times the device was in
use, and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it. For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions. Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed. Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    44.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

    a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction. Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

    b.    Digital devices capable of storing multiple
gigabytes are now commonplace. As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photographs
with an average size of 1.5MB.

    45.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

    a.    Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To unlock
a device enabled with a fingerprint unlock function, a user
places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition

function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **Ross**'s thumb and/or fingers on the **TARGET DEVICE** and (2) hold the **TARGET DEVICE** in front of **Ross**, with the party's eyes open to activate the facial, iris, and/or retina-recognition feature.

46.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### REQUEST FOR SEALING

47.   Reasonable cause exists to seal the applications, warrants, and warrant returns associated with this affidavit, as well as to seal this affidavit itself. This investigation is ongoing, and to this point, remains partially covert. Moreover,

the investigation involves a confidential source whose physical safety, absent sealing, could be jeopardized. Thus, there is reason to believe that failing to seal the applications, affidavit, warrants, and warrant returns will result in (1) endangering the life or physical safety of an individual, (2) flight from prosecution, (3) destruction or alteration of evidence, (4) intimidation of potential witnesses, (5) otherwise seriously jeopardizing the investigation, or (6) unduly delaying trial.

## CONCLUSION

48.  Based on the foregoing, there is probable cause to issue the requested warrant.


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this _____ day of _____, 2021.


_____
THE HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE

18